Good morning, Your Honors. In the Police Court and Counsel, I'm Phil Nino, and I represent Mr. Kevin Guinn on this matter. And also in the courtroom with us is Karen Lindholt, who represents the co-defendant, Matthew Dierck, on the matter. How are you going to deal with your time, since you have 20 minutes together? I would like to reserve. I think we're ready to take these as if they were separate. However, I'd like to reserve two minutes to rebuttal. All right. So at eight minutes, when you've used eight minutes, then I'll stop you, and then she can get up. Thank you, Your Honor. Mr. Guinn did plead guilty to conspiracy to distribute marijuana and hashish, and he's appealing the suppression motion denial by the District Court of the Eastern District of Washington, from which these cases arose. And he's also appealing his sentence on the basis of Booker. And what I'd like to do is rely on the brief with regard to the Booker issue, unless the Court has questions regarding that. The evidence at the suppression hearing, which took place a little bit over a year ago in the Eastern District of Washington, were that in response to some rural neighbors' report to the Border Patrol way up in northeast Washington, on the cold afternoon of December 23rd, the agent in charge of the Border Patrol in the region, as well as two other agents, backtracked three sets of boot prints down a snowy road traveling east from Highway 395. And those boot prints, after they backtracked for approximately a mile or a mile and a half, no, I'm sorry, more than that, two or three miles, well, the boot prints magically turned to snowshoe prints, which they continued to follow approximately a mile, a mile and a half, up to the Canadian border, indicating to them that three individuals had passed down in the snowy forest from the Canadian border. At the point roughly where the boots changed into the snow boots, the snowshoes, they also found a stash of more than 60 pounds of marijuana, some hashish, and the snowshoes, and some snow poles, and they were about 50 feet off the forest road, and they were covered with tree limbs and some snow. So they knew they were looking for smugglers. And the next logical thing that, and this is all from testimony at the suppression hearing, which was a two-day hearing. The next logical thing that the agent of charge testified that they should be doing is going nine miles south on the highway 395 to the Orient Bar, which is the first logical place where smugglers go. It had a pay phone. It was the first public establishment south of the border. So that's exactly what they did. Isn't there also some, is there some testimony about the border and what goes on at the border in this particular area? There certainly was, yes, Your Honor, and that's exactly why, and that was the basis for their decision to go to the Orient Bar because there was testimony that a year before with a cocaine smuggling situation, they went to the Orient Bar and they found the guys. These footprints went over to 395, didn't they? They did, Your Honor. They went west on this forest road parallel to the border to 395. And they backtracked essentially from around that intersection back east on the forest road and then up to the border. Now, once they reached 395, did the boot prints disappear or were they able to track them south? They diminished, I believe, somewhat quickly, and at the same time the roadway changed to pavement. Right. So such that they were creating a scenario where, well, the guys were walking on the pavement. And heading south. Heading south. So they went to the Orient Bar and they walked in. What was the testimony in terms of that? Obviously someone had reported three people at the border that looked like they didn't fit and a number of things. What was the time frame between that and when? And then they spent time tracking around, following all these footsteps. They find the dope and all of that. Your Honor, actually the agent in charge, Agent Eklund, was on his way home about 4 o'clock that afternoon when a call was relayed to him from rural neighbors, of which there are a few in this area, that they had spotted three strangers that were wearing snow clothing and I believe there was testimony about that there was some long hair. So about 4 o'clock in the afternoon is when the agent in charge started driving toward this area and gathered the two other agents and they started doing what they call sign cutting. And about how much later was the approach of your client? Let's see. They signed cut for quite some time and I believe, as I recall, the evidence would show it was approximately 7.30 or 8 o'clock when they approached the Orient Bar. Either counsel can correct me on that. Well, I guess my point there is you've got this tip, then you've got them out looking and tracing footprints and that's all pretty continuous in terms of by the time that they have the initial contact. Yes. Okay. All continuous. So you don't fault the fact that they should be looking for someone with this information? Not at all. They should be looking for your client? Right. Not with their testimony as to their expertise in tracking smugglers and the history of that area. They did walk in. They were all three uniformed. Two of them wore sidearms and they found... The first thing that checks the boots, though, right? The boots. As they approached, there was some checking of the boots. Now, there was testimony... I don't know. What would be wrong with that? To me, it would seem to me that if you've been following all the... For the last two hours, you've been tracking through the snow, following boots and snowshoes and all of this, and you know you've got three people and there's three people there, why wouldn't you... Why isn't it good police work to just go look at the boots? How intrusive is that? That is intrusive, unless somebody perhaps had their legs crossed. And there was testimony that there was a plain view of a bottom of one of the boots. However, when it was alleged that the agent in charge actually grabbed my client's boot and picked it up, I think that you're entering an area where that was an intrusion. It was certainly in the area of interrogation, certainly a custodial interrogation. Licking a boot? I think that's, yes. I think that, with the other facts of the matter, which I was about to get to, but if you look at the situation, they walk in and they find these three guys in the corner, separate from the other... Unfortunately, you've just about used your time, if you want to save for rebuttal. And I can't let you use co-counsel's time. If I... I would just stand up and continue the back pattern that he's reciting, so I will agree to allow him to continue on my client's behalf. When do you want me to cut him off? Because you're only getting 20 minutes together. I understand that. Five minutes left would be great, thank you. To leave you with... So seven more minutes for him, and I will take five. Okay, but do you want rebuttal, too, or are you just... No. Okay, thanks. I think that, as they walked in and they found these guys stung and shocked and sweaty and wet and with snow clothes on and on the floor in front of them near the fireplace, away from the crowd in the bar, I think at that point Carl Eklund, the chief, actually testified that we could have arrested him right there. We knew we had our men, but we didn't. We wanted to go investigate further to see if we could get him to... Didn't they have a reasonable suspicion at that point to make a terrorist stop and do exactly what they did? My, Your Honor, that is correct. He could have gone for... The agent said he could have arrested him right there, or what he did was they started asking questions, and these three guys gave him the runaround. At that point, they still knew they had their guys, although now they had more information. But the question was, what's wrong with the questioning? What's illegal about the questioning? There's nothing wrong with the questioning at that point because it's our position. Clearly... When does the illegal... You used up ten minutes. You still haven't gotten to your argument. When does the illegal conduct start? The illegal conduct started right at the finish of the questioning regarding identification and so forth. They had finished their terrorist stop questioning. As far as they were going to get at that point, they already knew they could arrest these guys and the point at which they went further to separate them... Do you agree at that point there was probable cause? Exactly. Yes, sir. So if there's probable cause, I don't understand. What's the problem? Well, it's coupled with the fact that there's testimony that these guys weren't free to leave at that point in time, and they continued to question them. They split them up to see if they could hang themselves. So prior to that, Miranda should have been issued, and it wasn't until more than 45 minutes later down in... What's your argument that they were in custody at that point? What are the indicia of custody here? Well, I think both... I think whether or not it's reasonable for a reasonable person to feel that they were at freedom to leave... But the test isn't... But isn't the test an objective one? It's not, I didn't think I could leave, or the police saying... It's an objective test, isn't it? It certainly is, Your Honor. It is an objective one, and objectively we're asserting the facts show that they were not free to leave. In addition, subjectively we're showing that they were not free to leave, and in addition, law enforcement even testified they weren't free to leave. So our big issue is when the honorable district court found that they were not in custody, that's basically what we have at issue in this matter. We feel that Miranda should have been given back right when they started asking identification questions and were cut off and were given the runaround. At that point, Miranda should have been invoked. They were in custody, so the suppression motion denial should be reversed. What did they say during the questioning that should have been suppressed? During the questioning, oh, a number of things. For example, as the law enforcement was going through one of the jackets on the floor, one of the suspects said, oh, that's bear spray you feel in that jacket on the floor at my feet. Another one was there were other statements on the way to Colville even after that point. Well, one statement was one gentleman asking for his coat back because he was cold on the way to Colville, but therefore an admission that that was his coat, even though it was on the floor of the bar when the officers went in the bar. They were under interrogation at that time. That's correct, and they still weren't given Miranda. All right. You don't have to if you're not going to be in custody. Oh, I'm sorry. I thought you said they were under interrogation. The circumstances we're asserting were that they were under custodial interrogation when they, at the point, they were not free to leave as even the law enforcement. My question is what did they say while they were under interrogation? It should have been Miranda. I think so far it's not much. In addition, we're asking to suppress what they found. And I'm thinking as quickly as I can about what they said. What did they find at the bar? Well. Besides the shoe prints. They found clothing similar to what was reported through the dispatcher that the guys were wearing. That doesn't cover interrogation. They found bear spray. They found some dough. Those things don't come from interrogation. You don't suppress, you know, those kinds of things because there was misinterrogation. At the suppression hearing, counsel, Mr. Maxey did ask to suppress everything found and said after the point when they assert there was interrogation had started. And, of course, nothing prior to that out in the woods. There is an issue of whether or not. I think you need to give some time to your co-counsel here. Thank you. I didn't want to interrupt Judge Tsushima, but I think she needs to get up here. All right. I'm going to give you five minutes, and I'll give him two minutes for rebuttal. Thank you very much. Karen Lindholt on behalf of the appellant defendant, Mr. Matthew Dirk. Just to continue to follow up on the facts and emphasize what Mr. Nino, what I did not hear him say is when the agents approached the defendants in the bar, began questioning, souls were checked, souls were lifted up. At that point, the agents concluded after approximately five minutes of questioning, the agents concluded they had a basis to arrest. They then handcuffed the defendants and patted them down. During that pat down, several things were found, including a compass, bear spray, marijuana hashish, papers belonging to Mr. Crook showing he was a Canadian citizen and had some child support issue. They were not Mirandized. They were then transported. They were separately transported down to Colville, which took approximately 45 minutes. During that transport, one of the agents testified that my client, Mr. Dirk, made a comment about the fact that allegedly stated without being asked that they would have gotten away with this had the border patrol not interfered something along those lines. It was definitely an incriminating statement. All right. But how was that interrogation? Well, the agent stated that my client blurted out the possession of my client. And what did the district court find? The district court concluded that, given the totality of the circumstances, that they did not need to be Mirandized until they got the procedure that occurred. So the district court essentially said the district court did not find that to be an interrogation, correct? Correct. All right. So that's a finding that's a factual finding by the district court. Yes. So we're going to have to give that some deference, right? Yes. Okay. Yes. Yes. And my client's position, and, of course, all of the client's position is that, and then, of course, once they got done at Colville, again, they were not immediately Mirandized. They were placed in holding cells, and, again, I believe a few other items were taken off their person. Only then did the DEA agents come up from Spokane and Mirandize. It just seems to me, and my client's position is, again, it's not a subjective, it's objective, given the. . . But what questions did they ask at that point? The primary questions were the ones asked up in the bar. The agents. . . No, but, I mean, when they were, you were saying you made the point that they weren't Mirandized after they'd been transported and they were there. Correct. I'm not aware of, you know, I almost feel like I'm, sort of like TV makes everyone think that they have to be told their rights and that that invalidates their arrest. But if no one asks you any questions, there isn't a legal requirement to give Miranda when someone's in custody. Sure. The majority of the questions were asked at the bar after my client's submit. The agents knew that they had enough to arrest them. They had them in custody. They were not free to leave, but they continued to ask them questions and they continued to answer. In addition, they took personal items which were incriminating. And you still have time. Okay. The, well, I guess in terms of, if we're talking back at the bar, and there, and, so what did the district court find was happening at the bar? That they were not in custody, correct? Yes. Correct. Okay. So that's a factual finding. Yes. But we still take all the facts there. Yes. And de novo look at them whether that's a custodial situation. Yes, exactly. And it is my client's position that looking at the totality of the circumstances, those three individuals objectively believed they were in custody because three agents had approached them. They were in Border Patrol uniform. I think a couple had their guns on. The guns were not drawn. They began to ask them to lift their feet. One of them picked up somebody's sole, actually touched them, lifted up his sole. When Mr. Gwinn attempted to drink his beer during the questioning, the officer would not let him. He slapped his hand away. And the officer testified he, that's, I don't want to give you a glass that you can throw at me or something like that. Yes. Is that interrogation? He was in custody and questions were being asked when he was under arrest. No, but lifting up the boot, is that interrogation? I would say lifting up the boot may not in and of itself because the totality of the circumstances added to the physical touching and lifting up the boot, as well as the, you know, preventing from drinking beer, as well as the separating of the individuals, as well as the statement that we knew we had enough information to arrest him, but continuing to ask questions was in violation of Miranda. All right. Thank you for your comments. May it please the Court. Good morning, Your Honors. George Jacobs on behalf of the United States Attorney's Office for the Eastern District of Washington. Your Honor, the United States' position is that this was a Terry stop, also known as an investigative stop, and this Court has held that that's a noncustodial interrogation. Therefore, the defendants were not in custody. There was no de facto arrest. And Miranda warnings were not required under the Fifth Amendment. Yeah, that came across pretty well in your brief. But the argument seems to be, well, there was a point at which these people were actually arrested and put in, notwithstanding Terry, and were put in custody, and that some interrogation or improper activity went on after that point. And they seem to say there was a point where they were – they stood up and they handcuffed them. And then after that, there was interrogation. Your Honor, when the agents entered the bar, they had reasonable suspicion. Right. That reasonable suspicion eventually ripened into probable cause. But that reasonable suspicion did not ripen into probable cause until approximately five minutes of questioning elapsed. And I think there was a point that I'd like to clarify. Is Mr. Dirk volunteered that there was bear spray in the one coat? That wasn't in response to questioning by one of the Border Patrol officers. There was no search of the clothing and the other personal items in the bar. There was a pat-down search conducted in the bar, the Orient Bar, a public establishment. And that's when one of the Border Patrol agents – Did they say that was for officer safety, or what did they say that was for? Your Honor, if memory serves me correctly, it was for officer safety reasons. But there was no further search done in the Orient Bar. It was just a pat-down search. Then they made the 35-minute trip down to the Colville Border Patrol Station. And then that's when a more extensive search of the clothing – and that's when the baggie of marijuana was found, a small cube of hashish, Mr. Crook's passports, and some other evidentiary items were found. But they weren't found in the bar. They were found down at the Colville Border Patrol Station 35 or so minutes later. And you would argue that the arrest did not occur until they were at the station? That is correct, Your Honor. And as the Court knows, a search incident to arrest is permitted. And that search was incident to the arrest of these three individuals. Therefore, it was not illegal. Well, when they put them in the car and took them down to the station, weren't they under arrest at that point? They weren't going anywhere. That is correct, Your Honor. You know, I'm pretty sure if I had been tracking around in the snow all this time chasing stuff and I found all that, you know, I don't think they were probably going anywhere pretty quickly after they came in there. That is correct, Your Honor. But the Border Patrol agents during that trip did not interrogate the three suspects, the three individuals. They terminated questioning in the Orient Bar. So they were in custody when they were put in the back of the car? Yes, Your Honor. But your position is they weren't interrogated, and so there wasn't a need to Mirandize them. Am I correct? My position, the United States' position, is that any questioning that took place at the Orient Bar, they were not in custody at that time. Right, I understand that. But once they got in the back seat of the car, even though that they were in custody at that point, when they certainly – well, where could they have gone? Well, Your Honor, if – They're in handcuffs in the back seat of a car? Well, there's the Galindo-Galagos case, and granted the facts are a little bit different here because in that case, I believe the questioning continued while the 15 or 20 illegal aliens, suspected illegal aliens, had been rounded up. They hadn't been placed in a car. If memory serves me correctly, I don't remember if in the facts in that case if the suspects were handcuffed or not in the Galindo-Galagos case. But – I think there's a case – I think no one was handcuffed in that. I think there's a handcuffing case in our record. But here they were handcuffed and driven 35 miles to the station. Well, but your point doesn't make any difference because there was no interrogation. That's correct. During that period. That is correct, Your Honor. Any further questions? No. Did you have anything else? No, Your Honor. All right, thank you. Thank you, Your Honor. All right, one of you has two minutes for rebuttal. Whoever would like to take it. I'm going to waive that time, Your Honor. All right. All right, then the matter will stand submitted. Thank you both for your arguments.
judges: Thompson, Tashima, Callahan